**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MANNY CHONG, THANE GALLO, and ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | **Case No. 1:20-cv-10844-RGS** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| NORTHEASTERN UNIVERSITY, | ) ) | |
| Defendant. | ) ) | |
| _____ | ) ) | |
| | ) | **Case No. 1:20-cv-10946-RGS** |
| DUNCAN LEGGET, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NORTHEASTERN UNIVERSITY, | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

I.   INTRODUCTION.................................................................................................. 1

II.  RESPONSE TO DEFENDANT'S STATEMENT OF FACTS ....................................... 4

    A.   **Northeastern Did Not Require Plaintiffs to Accept the Delivery of Services Language in the Portal Block Agreements** ................................................... 4

    B.   **Northeastern Was Capable of Making an Unambiguous Contract Offer Containing a Provision Similar to the Delivery of Services Language, But Did Not Do So** ................................................................................................................... 6

    C.   **All Plaintiffs Executed a SFRA, But SFRAs Do Not Limit Refunds Here** .............. 6

III. **LEGAL STANDARD** ........................................................................................ 7

IV. **ARGUMENT** ................................................................................................... 7

    A.   **The Portal Block Agreements Do Not Bar Plaintiffs' Claims** ................................. 8

        1.   The Portal Block Agreements are limited to terms concerning student conduct. 9

        2.   Northeastern did not reasonably communicate the Portal Block Agreement terms. ......................................................................................................... 10

        3.   The Delivery of Services language is not contractual ........................................... 14

        4.   Students do not accept the Delivery of Services language. .................................. 16

        5.   The Delivery of Services Language is unconscionable. ....................................... 17

    B.   **The SFRA Does Not Bar Plaintiffs' Claims** ........................................................ 22

    D.   **CONCLUSION** ....................................................................................... 24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ajemian v. Yahoo!, Inc.*,
  987 N.E.2d 604 (Mass. App. Ct. 2013) ...................................................................... 8

*Baetjer v. New England Alcohol Co.*,
  319 Mass. 592 (1946) ............................................................................................ 16

*Balles v. Babcock Power Inc.*,
  70 N.E.3d 905 (Mass. 2017) .................................................................................. 10

*Bull HN Information Systems, Inc. v. Hutson*,
  229 F.3d 321 (1st Cir. 2000) ........................................................................... passim

*Carmona v. Toledo*,
  215 F. 3d 124 (1st Cir. 2000) .............................................................................. 3, 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................ 7

*Cooper v. Charter Comm's., Inc.*,
  945 F. Supp. 2d 233 (D. Mass. 2013) ................................................................... 16

*Cullinane v. Uber Techs., Inc.*,
  893 F. 3d 53 (1st Cir. 2018) .............................................................................. 8, 18

*Diviacchi v. Affinion Grp., Inc.*,
  2015 WL 3631605 (D. Mass. Mar. 11, 2015) ....................................................... 17

*Domenichetti v. Salter School, LLC*,
  2013 WL 1748402 (D. Mass. Apr. 19, 2013) ........................................................ 22

*Douglas v. Johnson Real Estate Investors, LLC*,
  470 F. App'x 823 (11th Cir. 2012) ........................................................................ 22

*Duncan v. Nissan N. Am., Inc.*,
  305 F. Supp. 3d 311 (D. Mass. 2018) ................................................................... 18

*Ferguson v. Host Int'l, Inc.*,
  53 Mass. App. Ct. 96 (2001) ................................................................................. 19

*Herbert v. Vantage Travel Serv.*,
  444 F. Supp. 3d 233 (D. Mass. 2020) ................................................................... 16

*Hunter v. Skate III*,
  1999 WL 1080326 (Mass. App. Div. Nov. 23, 1999) ............................................ 16

*Kauders v. Uber Techs., Inc.*,
    159 N.E.3d 1033 (Mass. 2021) ...................................................................... 18, 19

*Kolbe v. BAC Home Loans Servicing, LP*,
    738 F.3d 432 (1st Cir. 2013) ............................................................................. 10

*Nat'l Federation of the Blind v. Container Store, Inc.*,
    2016 WL 4027711 (D. Mass. July 27, 2016) ............................................. 22, 23, 24

*Nicholas Zeo, Inc. v. Ry Express Agency, Inc.*
    317 Mass. 374 (1944) ....................................................................................... 16

*Resolution Trust Corp. v. North Bridge Associates, Inc.*,
    22 F.3d 1198 (1st Cir. 1994) ............................................................................... 3

*Vaks v. Ryan*,
    2014 WL 861455 (Mass. App. Div. Feb. 28, 2014) ............................................ 17

*Waters v. Min Ltd.*,
    587 N.E.2d 231 (Mass. 1992) ..................................................................... 18, 19, 22

*Zapatha v. Dairy Mart, Inc.*,
    408 N.E. 2d 1370 (Mass. 1980) ................................................................... 18, 19

**Statutes**

9 U.S.C. § 1 ......................................................................................................... 22

**Rules**

Fed. R. Civ. P. 56 ......................................................................................... 3, 4, 7, 24

**Other Authorities**

17 R. Bishop, *Massachusetts Practice*, § 2.2, at 15 (4th ed. 1997) ......................... 8, 10

## I.  <u>INTRODUCTION</u>

Defendant Northeastern University's ("Northeastern") motion for summary judgment (the "Motion" or "Mot.") is wholly dependent on Northeastern proving that Plaintiffs entered into contractual agreements that foreclose Plaintiffs' claims. The Motion must be denied because Northeastern has failed to carry its burden to show that (1) Northeastern reasonably communicated the contractual terms to Plaintiffs, a precondition to a finding of contract formation and (2) even if agreed, the agreements apply to foreclose the claims presented here.

Plaintiffs allege that they had contracts with Northeastern, under which Plaintiffs would agree to pay tuition and fees in exchange for Northeastern providing in-person educational services and access to specified campus facilities and events. Consolidated Amended Complaint ("CAC"), *Chong*, ECF No. 74, ¶¶1-14. Plaintiffs allege that, by closing campus and transitioning in-person courses to online-only formats, Northeastern breached its contracts with Plaintiffs, and Northeastern should be required to refund a portion of the tuition and fees Plaintiffs paid. *Id.*

In its premature effort to dismiss Plaintiffs' claims at summary judgment, Northeastern invokes (1) an agreement Northeastern extracts by "blocking" students' access to the *myNortheastern* portal (wherein they can register for courses, view their grades, etc.) (the "Portal Block Agreement"), which Northeastern asserts includes a "Delivery of Services" term that forecloses Plaintiffs' claims, and (2) a Withdrawal/Leave of Absence policy (referred to herein as the "Withdrawal Policy") and related "refund schedule" that Northeastern asserts is incorporated in Student Financial Responsibility Agreements ("SFRAs") and which it asserts forecloses any contractual right to a refund here. Both attacks fail.

Northeastern did not reasonably communicate that the "Delivery of Services" language was part of the Portal Block Agreement. First, the Portal Block Screen only requested that

students "agree to abide by the policies set forth" in their respective handbooks. The "abide by" language indicates that students were agreeing to policies that restricted their conduct, not anything concerning Northeastern's purported disclaimer of liability or reservation of rights.

Second, even assuming students could have reasonably understood their agreement to "abide by" policies in the handbooks included every statement in their handbooks, the Portal Block Agreement did not reasonably communicate the terms of the agreement. To find the "Delivery of Services" language, Northeastern required students to click multiple links from the Portal Block Agreement screen to find it, and the pages through which Northeastern directed students only increased the ambiguity and inherent confusion as to the terms of those agreements. Undergraduate students had to click the handbook link, which took them to an Office of Student Conduct page that included a separate link for the Undergraduate Student Handbook ("Undergraduate Handbook"). Students then had to click that second link to view the handbook and find the "Delivery of Services language in the back of that Handbook (page 69) in a section titled "Additional Information." And long before reaching the "Additional Information" section, the undergraduate student would first read, **on the very first page of content**, that the handbook's information "is not intended to be and should not be regarded to be contractual and is subject to change at the discretion of the University."

For graduate students, the link for the "Graduate Handbook" takes students to a webpage in the middle of the HTML version of the Graduate *Catalog* called "General Regulations."[1] To find the "Delivery of Services" language, a graduate student would have to intuit that the Portal

_____

[1] Northeastern contends that students must reasonably understand that the "Graduate Handbook" reference on the Portal Block screen refers to the *Catalog* because no such handbook exists. But Northeastern does have "Graduate Handbooks." *See* CSOF ¶63. And in any event, Northeastern, as the drafter of this contract of adhesion, is not entitled to such a loose interpretation.

Block Agreement (1) encompassed more than the General Regulations section of the Graduate Catalog, (2) that the "Appendix" was within the scope of the Agreement and click on the link, (3) that the "General Information" subsection of the Appendix contained contractually binding language associated with the Portal Block Agreement, and click on that third link. Even once the student reached the "General Information" page, the student would first read that the Catalog "is not intended and should not be regarded to be contractual." And there is nothing conspicuous about the Delivery of Services language on that page. With the exception of the italicized heading, it is in the same font and type size as the surrounding text, with nothing to set it off, such as bold type, upper case letters or surrounding markets or symbols.

Similarly, the Withdrawal Policy Northeastern relies on – by its express terms – does not apply to the situation here and does not purport to be the sole circumstance for students to obtain refunds. The Withdrawal Policy is limited to the situation where a student seeks to withdraw from courses or the University "for academic, discipline, personal, or medical reasons." The cited "refund schedule" relates solely to the Withdrawal Policy and does not purport to apply outside of that context. In any event, Northeastern fails to reasonably communicate the refund schedule to students because the SFRA does not properly identify the refund schedule and there is no clearly identified way to find the refund schedule from the Withdrawal Policy page.

Further, even if the Court agrees with Northeastern's view of the implications of the contractual agreements to which it claims Plaintiffs agreed, many of the salient facts on which Northeastern relies are disputed. Accordingly, Plaintiffs are entitled to discovery pursuant to Fed. R. Civ. P. 56(d) to rebut Northeastern's purported "undisputed" facts.[2] *See generally* Affidavit of

---

[2] *See*, *e.g., Carmona v. Toledo*, 215 F. 3d 124, 133 (1st Cir. 2000); *Resolution Trust Corp. v. North Bridge Associates, Inc.*, 22 F.3d 1198, 1203 (1st Cir. 1994).

Patrick F. Madden ¶¶29-73 ("Madden Aff.") (attached as **Ex. B**). Plaintiffs have diligently sought discovery that would be capable of rebutting material facts Defendant asserts are "undisputed." Defendant has failed to produce *any* documents in response to Plaintiffs' discovery requests to date. Defendant's responses to additional timely requests are outstanding. *Id.* Thus, if the Court is not inclined to deny the Motion—it should—Plaintiffs request the opportunity to take the discovery to which they are entitled under Fed. R. Civ. P. 56(d).

## II.  RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

Northeastern's Motion relies on both disputed and undisputed facts as well as "facts" for which Plaintiffs have been deprived of the opportunity to develop any record whatsoever. In Plaintiffs' Counterstatement of Facts ("CSOF") (attached as **Ex. A**), Plaintiffs set forth (for each purported "undisputed material fact") whether Plaintiffs dispute, do not dispute, or require discovery to determine whether there is a dispute. Plaintiffs summarize that record:

### A.  Northeastern Did Not Require Plaintiffs to Accept the Delivery of Services Language in the Portal Block Agreements

Northeastern's Motion largely depends on its assertion that Plaintiffs agreed to Northeastern's reservation of a right to change its courses and programs in any way whatsoever and that Plaintiffs also agreed Northeastern had no liability for any failure to provide promised educational services. *See* SOF ¶¶10-30, 36-37, 46-47, 51-72, 77-78, 84-85. Northeastern bases this contention solely on the Portal Block Agreements' purported incorporation of the "Delivery of Services" language from the Undergraduate Handbook and the Graduate Catalog. Putting aside the legal insufficiency of these facts (discussed *infra*), the relevant facts are as follows.

Plaintiffs do not dispute that Northeastern imposed a "Portal Block" that barred students from accessing the *myNortheastern* portal until the student clicked "Accept" on the Portal Block screen. *See* SOF ¶¶13-22, 53-62; CSOF ¶¶13-22, 53-62. This screen, which was common to all

students, had different implications depending on whether the student is an undergraduate (like Plaintiffs Gallo and Legget) or a graduate student (like Plaintiff Chong), because it referred these different types of students to different "handbook" materials. *See id.* For undergraduates, the screen references the Undergraduate Handbook, and for graduate students, the screen references the "Graduate Handbook." *Id.* The screen describes these handbooks as containing "academic regulations, the Code of Student Conduct, and the Academic Integrity Policy." *Id.* The screen then demands that students click "Accept" to "acknowledge [the student has] been notified of the availability of the Student Handbook, Northeastern's Code of Student Conduct, and the Academic Integrity Policy, [has] read them, underst[ood] their meaning and agree to abide by the policies set forth." *See* SOF ¶¶20-22, 60-62; CSOF ¶¶20-21, 60-61.

On the Portal Block screen, Northeastern provided links representing that those links would direct students to the handbooks. SOF ¶¶20-21, 60-61; CSOF ¶¶20-21, 60-61. The links did not, in fact, direct students to the handbooks. SOF ¶¶25-28, 65-71; CSOF ¶¶24-28, 64-71. For undergraduates, the link went to a page titled "Code of Student Conduct" that in turn included a second link for the Undergraduate Handbook. SOF ¶¶25-28; CSOF ¶¶24-28. For graduate students, the link directed the student to a webpage titled "General Regulations" in the middle of the HTML version of the Graduate Catalog. SOF ¶¶65-71; CSOF ¶¶64-71.

Neither the Portal Block screen nor the pages to which it linked (1) contained any reference to the Delivery of Services language, (2) otherwise described the Delivery of Services language, or (3) identified to the student that the student was agreeing to the Delivery of Services language as a contractual term. *See* SOF ¶¶20, 60. In fact, both the Undergraduate Handbook and the Graduate Catalog, which contain the Delivery of Services language, explicitly state that they are not intended to and should not be regarded as contractual. *See, e.g.*, CSOF ¶¶11, 52.

5

**B.  Northeastern Was Capable of Making an Unambiguous Contract Offer Containing a Provision Similar to the Delivery of Services Language, But Did Not Do So**

Following the Spring 2020 semester, Northeastern altered its form SFRA to include an express provision that (1) referenced the "Delivery of Services" language, and (2) made clear that if Northeastern alters its operations due to, *inter alia*, a pandemic, "Northeastern may … modify its operations …, which may … include offering online … options, in its discretion. In any such event, Northeastern University is under no obligation to refund or credit any portion of tuition, fees, or other charges…." CSOF ¶90. There is no basis on which to conclude Northeastern was incapable, prior to Spring 2020, of including a clear statement like this of its reservation of rights and force majeure provision in the SFRA or otherwise prominently displayed to students as part of a clear contract offer. *Id.* ¶¶90-91.

**C.  All Plaintiffs Executed a SFRA, But SFRAs Do Not Limit Refunds Here**

The Parties agree that every student, including Plaintiffs, executed substantially identical SFRAs. *See* SOF ¶¶1-3, 35, 40-41, 43, 49-50, 74-75, 82-83, 86-87; CSOF ¶¶1-3, 35, 40-41, 43, 49-50, 74-75, 82-83, 86-87. As Plaintiffs allege in the CAC, the SFRA incorporates course registration and the obligation to pay tuition and fees. *See, e.g.*, CAC ¶32; *see also* SOF ¶2.

Northeastern asserts that the SFRA incorporates (1) the Withdrawal Policy and (2) the "published … refund schedule."[3] SOF ¶¶2-5. While Plaintiffs do not dispute that the SFRA

---

[3] The SFRA uses two different terms: "published withdrawal refund schedule" and "published tuition refund schedule," but does not provide a link to either. *See* SOF ¶2. Northeastern includes a screenshot of the purported "tuition refund schedule," but provides no evidence as to where such schedule was "published" or otherwise made available. *See* CSOF ¶5. Indeed, it is unclear whether the SFRA refers to a single "refund schedule" or two different "refund schedule[s]," and Northeastern's failure to identify the source for either or both in its Motion is fatal to its effort to rely on the "refund schedule." No student could reasonably identify the refund schedule to "accept" it as a contractual term in this circumstance. Furthermore, notwithstanding the SFRA's statement that the "withdrawal refund schedule" was "posted" on the Withdrawal Policy webpage, (1) there was no refund policy schedule on that page–indeed the term "refund" did not appear in the policy statement on the linked page, and (2) the link to the "refund schedule" was

incorporates the Withdrawal Policy, CSOF ¶¶2-5, the Withdrawal Policy is irrelevant to the present dispute on its face. Indeed, the express terms of the policy as referenced on the webpage linked to the SFRA limit the policy's application to the circumstance where "[s]tudents … need to withdraw or take a leave of absence from the university … for academic, discipline, personal, or medical reasons." *See* SOF ¶5; CSOF ¶5.

Northeastern's reliance on the similar "published … refund schedule" fares no better. The only "refund schedule" Northeastern identifies concerns the circumstance where a student withdraws from course(s) and/or the University, and also is thus irrelevant, SOF ¶5; CSOF ¶5, since Plaintiffs are not seeking a refund associated with withdrawal. *See* CSOF ¶5. The Withdrawal Policy and related refund schedule are demonstrably not the sole avenue for tuition and fee refunds. *See* CSOF ¶¶5. For example, Defendant provides refunds in other circumstances such as the case of an overpayment. *See Id.*

### III. LEGAL STANDARD

Summary judgment is proper when no genuine issue of material fact remains and, viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party "bears the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law." *Carmona*, 215 F.3d at 132. The court regards as true the nonmoving party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324.

### IV. ARGUMENT

Northeastern's Motion relies on purported contracts that are not enforceable for multiple

---

not labeled as a "refund schedule," nor was it available to users who viewed the page on a mobile device or who used a narrow browser window. *See* CSOF ¶5.

related reasons. Each alleged contract contains issues as to whether the terms Northeastern seeks to enforce were (1) "reasonably communicated," either because the terms were not properly identified and supplied or because the language is ambiguous, and (2) "accepted" by the student. *See Ajemian v. Yahoo!, Inc*., 987 N.E.2d 604, 611-12 (Mass. App. Ct. 2013); *Cullinane v. Uber Techs., Inc.*, 893 F. 3d 53, 62 (1st Cir. 2018). To show it "reasonably communicated" the contract terms and "acceptance" thereof, Northeastern must show it provided "[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms." *Ajemian*, 987 N.E.2d at 612. Northeastern's agreements were ambiguous, failed to provide reasonably conspicuous notice of the terms Northeastern now seeks to enforce, and thus Plaintiffs did not unambiguously assent. Further, each of these agreements are at best contracts of adhesion because Northeastern presented all terms on a take-it-or-leave-it basis. *See* CSOF ¶93. While a contract is not unenforceable merely because it is adhesive, such contracts "are construed strictly against the drafter and the risks of ambiguity fall on the drafter." *Bull HN Information Systems, Inc. v. Hutson*, 229 F.3d 321, 331 (1st Cir. 2000) (citing 17 R. Bishop, *Massachusetts Practice*, § 2.2, at 15 (4th ed. 1997)).

In addition, the Portal Block Agreements are deficient because the terms Northeastern seeks to enforce are unconscionable. Courts refuse to enforce terms of contracts of adhesion that are unconscionable or unfair in the particular circumstance as the Delivery of Services language is presented here. *See Bull HN*, 229 F.3d at 331. In other words, the key questions are whether the terms can be said to have been "reasonably communicated" and actually "accepted" so as not to result in unfair surprise, or whether the terms are unreasonably one-sided so as to make the contract unconscionable.

### A. The Portal Block Agreements Do Not Bar Plaintiffs' Claims

Defendant's Motion as to the Portal Block Agreements suffers numerous deficiencies,

some common to the two types of students (undergraduate and graduate) and some specific to either type of student.

### 1. The Portal Block Agreements are limited to terms concerning student conduct.

The Portal Block screen's language, when read in full, focuses entirely on policies and regulations of students' conduct. Under the header "Student Handbook and Code of Student Conduct," the language opens by stating that there are "links for the Student Handbook and the Code of Student Conduct, which includes a link to the Academic Integrity policy...." SOF ¶20. The rest of the paragraph exclusively refers to the Code of Student Conduct. The next paragraph provides only that "[t]he list of academic regulations, the Code of Student Conduct, and the Academic Integrity Policy may be found in student handbooks," and then states that students are expected to know the content of their handbook and where students may obtain physical copies of their handbook. *Id*. Read together, these two paragraphs focus exclusively on (1) the Code of Student Conduct, (2) the Academic Integrity Policy, and (3) "academic regulations;" and refer to the handbooks only as the location to find such policies regulating students' conduct. *See id.* Then, following the links purportedly directing students to the handbooks,[4] the Portal Block screen presents the language of purported "agreement":

> By selecting the ACCEPT button below you acknowledge you have been notified of the availability of the Student Handbook, Northeastern's Code of Student Conduct, and the Academic Integrity Policy, have read them, understand their meaning and agree to abide by the policies set forth.

SOF ¶¶20-21. Given the preceding language that focuses on the "handbooks" only to the extent the handbooks contain "[t]he list of academic regulations, the Code of Student Conduct, and the Academic Integrity Policy," the language of the purported agreement's use of the phrase "abide

---

[4] As discussed herein, Northeastern's Statement of Facts admits that these links do not direct students to the handbooks. *See* SOF ¶¶25-28, 65-71; CSOF ¶¶24-28, 64-71; Sec. II.A., *supra*.

by the policies set forth" is reasonably read to restrict students' agreement only to complying with Northeastern's rules and regulations concerning student conduct found in the handbooks.

Northeastern takes an unreasonably broad view of this language by seizing on the vague statement that "students are responsible for knowing the content of their respective handbooks" to argue that when the student agrees "to abide by the policies"[5] set forth in the handbook, the student must necessarily be agreeing to every statement in the handbook as a contractual term. At best, Northeastern identifies an ambiguity as to whether the student's agreement "to abide by the policies" in the handbook constitutes an agreement to the Delivery of Services language that does not contain any policy by which a student must "abide."

Due to these ambiguities, the materials that purportedly comprise the Portal Block Agreements are ambiguous and otherwise fail to reasonably communicate their terms. Northeastern, as the drafter of the Portal Block Agreements (contracts which are adhesive because no negotiation is permitted or possible), bears the risk of the ambiguity. *Bull HN*, 229 F.3d at 331 (citing 17 R. Bishop, *Massachusetts Practice*, § 2.2, at 15 (4th ed. 1997)); *see also Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 460 (1st Cir. 2013) (ambiguities in form mortgage contracts are construed against the drafter). "To determine whether [contractual] language … is ambiguous, we look both to the contested language and to the text of the contract as a whole." *Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 912 (Mass. 2017).

### 2.  Northeastern did not reasonably communicate the Portal Block Agreement terms.

The language Northeastern uses for the Portal Block Agreements does not reasonably

---

[5] There is no reasonable argument that a student acknowledging having "read" and "underst[oo]d the meaning of" the handbook means either that the student shares Northeastern's understanding of the meaning (especially given the ambiguities discussed herein) or that such acknowledgment confers an expansive reading of the phrase "agree to abide by the policies set forth." The Delivery of Services language plainly does not constitute a policy by which the student would "abide" under any reading.

communicate the agreements' terms. As set forth above, the Portal Block screen is ambiguous as to whether the purported agreement is limited to policies governing students' conduct, or a broader agreement. But it gets worse. Northeastern contends that the Portal Block Agreements incorporate specific documents based on the Portal Block screen: For undergraduate students, the contract incorporates the Undergraduate Handbook and for graduate students, the contract purportedly incorporates the Graduate Catalog. *See, e.g.*, SOF ¶¶13-29, 53-71 & Mot. at 2, 4. Neither incorporation is proper, and neither reasonably communicates the contractual nature of the Delivery of Services language.

> ### a. The Portal Block Agreement does not reasonably communicate the Delivery of Services language to graduate students.

For graduate students, the Portal Block screen refers to a "Graduate Handbook," not the "Graduate Catalog." SOF ¶60. Northeastern contends that it does not matter that the Portal Block screen refers to the "Graduate Handbook," and not the "Graduate Catalog" because the "Graduate Handbook" does not exist.[6] *See* SOF ¶¶64-65. *But see* CSOF ¶63 (citing Northeastern's Graduate Handbooks). But Northeastern's suggestion that a graduate student must understand that "Graduate Handbook" means "Graduate Catalog" merely because the "Graduate Handbook" does not exist as a separate document is misguided. Northeastern, as the drafter of this contract of adhesion, has the obligation to clearly state the terms of the agreement

---

[6] Northeastern also argues that the Graduate Catalog is functionally the same as a student handbook because it "contains information on courses, programs, and university policies and regulations … [and thus] contains all provisions of a catalog and a handbook." SOF ¶65. Not so. First, the Graduate Catalog's clear analog is the Undergraduate Catalog, not the Undergraduate Handbook. *See* CSOF ¶65. Second, the Graduate Catalog does not contain all the types of information in the Undergraduate Handbook. While the Catalog contains some of the same information, the Graduate Catalog does not contain the Code of Student Conduct (nor does the Undergraduate Catalog), whereas the Undergraduate Handbook devotes 23 pages (more than 25% of the document) to the Code. *Id.* In any event, at most, the reference to the "Graduate Handbook" would be a subset of the Graduate Catalog material for the reasons set forth herein.

and bears the risk of any ambiguity. *See, e.g.*, *Bull HN*, 229 F.3d at 331.

Northeastern does not fix this deficiency by linking to the Graduate Catalog from the Portal Block screen. Indeed, Northeastern itself admits that the link does not go to the Graduate Catalog as a whole, or even to the beginning of the Graduate Catalog. CSOF ¶¶52, 66. Rather, clicking on the "Graduate Handbook" link takes the user to the "General Regulations" section of the Graduate Catalog. *Id.* Thus, a reasonable reading of the term "Graduate Handbook" reference in the Portal Block screen—particularly given the focus of the Portal Block screen's language on regulations of student conduct—is that the "Graduate Handbook" refers only to the "General Regulations" section of the Graduate Catalog and not the Graduate Catalog as a whole. Indeed, the "General Regulations" section of the Graduate Catalog is a subsection of the "University-Wide Academic Policies and Procedures" section that contains various policies concerning student conduct including, without limitation, policies concerning hazing, drug and alcohol use, weapons, a link to the Academic Integrity Policy, restrictions on students' use of Northeastern's computers and network resources, gambling, and misconduct in the classroom. *Id.*[7] These same policies can be found in the Undergraduate Handbook. CSOF ¶52.

Nothing in the General Regulations subsection references the Delivery of Services language, and the Delivery of Services language was buried and not apparent to a student reviewing the General Regulations page. CSOF ¶66. Indeed, to find the Delivery of Services

---

[7] Further supporting this interpretation is Northeastern's "Code of Student Conduct." The Code does not appear to exist at Northeastern as a separate document from the Undergraduate Handbook. Neither the Graduate Catalog, the Undergraduate Catalog, or even the webpage titled "Code of Student Conduct" actually contain the Code. Instead, the only place the Code appears to exist other than the Undergraduate Handbook is as a standalone PDF that Defendant links to from the Code of Student Conduct webpage. CSOF ¶92. But that PDF is just an excerpt of pages 5-27 of the Undergraduate Handbook. *Id.* Thus, the Code is only a subsection of the Undergraduate Handbook without any independent existence. The "General Regulations" subsection of the Graduate Catalog thus appropriately constitute the "Graduate Handbook."

language, the student would need to (1) intuit that there was some contractual language in the "Appendix" link on the left-hand panel, (2) click that Appendix link, (3) review the list of links on the Appendix table of contents page and recognize that the link in the Appendix described only as "General Information" contained pertinent contractual information – the Delivery of Services language, (4) click the General Information Link, (5) read Northeastern's statement that the Catalog contains information that "is not intended and should not be regarded to be contractual," (6) understand that the further information in this "General Information" section will nevertheless be contractual in nature, and (7) continue reading to and through the Delivery of Services language that follows. *Id.* ¶¶52, 64-66.[8]

Ultimately, the only thing Northeastern reasonably communicated to graduate students is that clicking "Accept" would mean they agree to the policies in the "General Regulations" subsection of the Graduate Catalog. At best, it is a question of fact whether Northeastern reasonably communicated the Delivery of Services language to graduate students.

> **b.  Northeastern does not reasonably communicate the Delivery of Services language to undergraduate students.**

For the undergraduate students, the Portal Block screen purports to direct students to the Undergraduate Handbook. SOF ¶20. However, according to Northeastern, clicking on the link for the Undergraduate Handbook did not take the student to the handbook. SOF ¶25. Instead, the link brought the student to a webpage titled "Code of Student Conduct" on Northeastern's Office of Student Conduct and Conflict Resolution website. *Id.* Clicking the link for "2019-2020 Student Handbook" on that page took the student to an 86-page PDF of the Undergraduate Handbook. SOF ¶27. Northeastern offers no reason for why a student clicking the link for the

---

[8] There is nothing conspicuous about the delivery of services language on the "General Information" page. Aside from the italicized heading, nothing sets it apart: no different font, no larger type, no bold print or uppercase letters, no separation by any marks or symbols.

Undergraduate Handbook containing the "policies" that Northeastern purportedly was demanding the student to "agree to abide by" would not be taken directly to the handbook PDF itself. By directing the student to the Code of Student Conduct webpage instead, Northeastern reinforces the interpretation that the Portal Block language is only concerned with policies regulating student conduct which the student agrees to "abide by."

In any event, once the student clicks on "2019-2020 Student Handbook" on this second student conduct webpage and navigates to the 86-page PDF of the Handbook, Northeastern confronts the student with significant information. First, the table of contents breaks the handbook into four principal sections: (1) "University Regulations," (2) "Additional Information", (3) "Northeastern University Campus Map," and (4) "Index." CSOF ¶11. Given that the Portal Block's language focuses on conduct regulations, Northeastern only reasonably communicates that this first section, "University Regulations," is the part of the Undergraduate Handbook that the student "agrees to abide by."[9]

### 3.  The Delivery of Services language is not contractual

Each of the Graduate Catalog and the Undergraduate Handbook, where the Delivery of Services language that Defendant contends is contractually binding may be found, expressly disclaim that the contents of the documents are contractual. In the Undergraduate Handbook, on the very first page of content, Northeastern provides:

> The Undergraduate Student Handbook contains information current as of the date of printing; however such information is not intended to be and should not be regarded

---

[9] Although both the table of contents and this page reference the "Delivery of Services" part of the handbook, that does not affect the analysis. Referring a student to "more information on … Delivery of Services" does not provide reasonable notice of what the information is. Indeed, the Delivery of Services language includes a purported disclaimer of liability akin to a *Force Majeure* clause as well as a purported reservation of the right to change the format of instruction and close campus without refunds. By burying the nature of this language at the end of an 86-page document that prominently disclaims contractual force and effect, Northeastern does not reasonably communicate the Delivery of Services language to be a purported contract term.

to be contractual and is subject to change at the discretion of the University. CSOF ¶11. Similarly, in the Graduate Catalog, Northeastern disclaims that Catalog contains "current information about the university calendar, admissions, degree requirements, fees, and regulations; however such information is not intended and should not be regarded to be contractual" immediately above the Delivery of Services language in the General Information section of the Appendix. *Id.* ¶52.

Northeastern contends that the ambiguous language disclaiming the contractual nature of information in the Graduate Catalog, *when construed in Northeastern's favor*,[10] is explicitly limited to the "university calendar, admissions, degree requirements, fees, and regulations." Mot. at 18. Northeastern makes no such argument as to the Undergraduate Handbook—and indeed cannot because the contractual disclaimer in the Undergraduate Handbook explicitly refers to all the information in the document being non-contractual. *See* CSOF ¶11.

As to the Graduate Catalog, however, Northeastern's argument still fails. Northeastern relies on "canons of contract construction," but for those canons to apply, there must first be a contract. In other words, courts do not interpret the contractual meaning of a document that does not cross the threshold to being a contract. Here, the Portal Block Agreement is what Northeastern contends creates the contract. The Portal Block (which does not refer directly to the Graduate Catalog at all) references regulations, the Code of Student Conduct, the Academic Integrity Policy, and "policies" that the student "agree[s] to abide by" contained within the "Graduate Handbook." Thus, even accepting that the Graduate Catalog in its entirety is synonymous with the "Graduate Handbook" (and it is not), either the Delivery of Services language is a regulation or similar material for which the non-contractual disclaimer applies, or

---

[10] Of course, this ambiguous language must be construed against Northeastern, both the drafter of the agreement and the movant.

the Delivery of Services language is not within the scope of the students' acceptance of the

Portal Block Agreement. In either case, Northeastern does not establish that the Delivery of

Services language is part of any contract between graduate students and Northeastern.

Northeastern's further argument—that the Delivery of Services language would be

meaningless if non-contractual—misses the point. Northeastern could have myriad documents

and language from a scrap of paper in the provost's office, to an email sent to the janitor, that

could purport to have contractual effect on students and no purpose without such effect. But

unless Northeastern actually makes such language part of a valid contract, it lacks contractual

effect and the existential concern of the material's purpose is not one for court resolution.[11]

### 4.   Students do not accept the Delivery of Services language.

As set forth above, the Portal Block Agreements present significant factual disputes as to

whether Northeastern reasonably communicated that the Delivery of Services language is part of

a binding contract between Plaintiffs (and other students) and Northeastern. But there is a second

layer. Not only did Northeastern fail to reasonably communicate that the Delivery of Services

language is part of these agreements, but also Plaintiffs (and other students) did not actually

---

[11] Northeastern further argues that because other force majeure clauses have been upheld by other courts, this one must be as well. Mot. at 19-20. Each case is easily distinguished because, inter alia, there was no dispute as to whether the force majeure was clearly and unambiguously part of a contract between the parties. *See Herbert v. Vantage Travel Serv.*, 444 F. Supp. 3d 233, 240-41, 243 (D. Mass. 2020) (no dispute that force majeure was in document that formed agreement and was prominently listed under "boldface heading of 'Responsibilities and Liabilities'" and plaintiffs identified no ambiguous language); *Cooper v. Charter Comm's., Inc.*, 945 F. Supp. 2d 233, 242-43 (D. Mass. 2013) (force majeure was in the contract plaintiffs alleged defendant breached; but regardless, the cable company was bound to provide rebates for period for which it did not provide the services promised); *Baetjer v. New England Alcohol Co.*, 319 Mass. 592, 595 (1946) (force majeure was in contract negotiated by sophisticated parties); *Nicholas Zeo, Inc. v. Ry Express Agency Inc.*, 317 Mass. 374, 375-76 (1944) (no dispute that force majeure was in contract; dispute concerned whether circumstances fell within scope of force majeure); *Hunter v. Skate III*, 1999 WL 1080326, at *2 (Mass. App. Div. Nov. 23, 1999) (plaintiff signed waiver that "clearly and comprehensively" waived liability).

accept the Delivery of Services language. Indeed, the proper reading of the Portal Block

screen—which is the only place Defendant asserts it asks Plaintiffs and other students to accept

any part of the Undergraduate Handbook or Graduate Catalog—is that it only asks the student to

"Accept" that the student "agree[s] to abide by policies" set forth in, *inter alia*, the applicable

handbook. Thus, for both graduate and undergraduate students, this language focuses on policies

that govern the students' conduct, not on Northeastern's purported disclaimer of contractual

liability for failing to provide services or Northeastern's purported reservation of rights to make

changes to the format of promised educational services.[12]

### 5.  The Delivery of Services Language is unconscionable.

Assuming the Delivery of Services language is a contract term in the Portal Block

Agreement (it is not), such term is unconscionable. Courts refuse to enforce contracts of

adhesion that are unconscionable or unfair in the particular circumstance. *Bull HN*, 229 F.3d at

331. In determining whether a contract is unconscionable, courts apply a two-part test to

determine whether there was "an absence of meaningful choice on the part of one of the parties

together with contract terms which are unreasonably favorable to the other." *Diviacchi v.*

*Affinion Grp., Inc.*, 2015 WL 3631605 (D. Mass. Mar. 11, 2015) (quoting *Vaks v. Ryan*, 2014

WL 861455, at *2 (Mass. App. Div. Feb. 28, 2014)). Pursuant to this method, the party

challenging the contract as unconscionable must demonstrate both procedural unconscionability

(that the circumstances surrounding the formation of the contract show that the aggrieved party

was subject to unfair surprise) and substantive unconscionability (that the terms are unreasonably

favorable to one party such as a "gross disparity in consideration" or if the terms are oppressive

---

[12] Plaintiffs further incorporate by reference all the arguments herein concerning the ambiguities
and other issues with Northeastern identifying the Delivery of Services language as part of a
contract. These ambiguities create a factual dispute as to whether the student actually accepts the
Delivery of Services language.

to one party). *Waters v. Min Ltd.*, 587 N.E.2d 231, 235 (Mass. 1992); *Zapatha v. Dairy Mart, Inc.*, 408 N.E. 2d 1370, 1376 (Mass. 1980). At core, the question is whether the contract provision in question could result in unfair surprise and was oppressive to the disadvantaged party. *See Duncan v. Nissan N. Am., Inc.*, 305 F. Supp. 3d 311, 318 (D. Mass. 2018) (quoting *Zapatha v. Dairy Mart, Inc.*, 408 N.E. 2d 1370, 1376 (Mass. 1980)).

### a. The Delivery of Services language is procedurally unconscionable.

As discussed above, Northeastern's adhesive Portal Block Agreements cause unfair surprise to the extent they incorporate the Delivery of Services language that purportedly bars the claims here. The unfair surprise derives from the numerous issues described *supra*, including, *inter alia*: (1) the Portal Block screen focuses on policies restricting student conduct and the language of agreement only requires the student agree to "abide" by such policies; (2) the Delivery of Services language is buried, requiring the student to click multiple links from the Portal Block screen to discover the Delivery of Services language (and in the case of the undergraduate students, the students must also scroll through nearly 70 pages to get to the page containing the language after navigating multiple links); (3) the document or page on which the Delivery of Services language appears explicitly states that the document is not intended to be contractual and could change at any time; and (4) once on the page containing the Delivery of Services language, there is nothing conspicuous[13] about that language to draw the reader's

---

[13] Northeastern asserts that Massachusetts law "eschews a 'conspicuousness' requirement." Mot. at 22 (citing *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1048-49, n.25 (Mass. 2021)). Northeastern both **tacitly admits the Delivery of Services language is not conspicuous** and misunderstands the law. First, *Kauders* stated that where the drafter "cho[oses] not to use a common method of conspicuously informing users of the existence and location of terms and conditions … courts must … carefully consider the totality of the circumstances…. Where the connection between the action taken and the terms is unclear … it will be difficult for the offeror to carry its burden to show that the user assented to the terms." *Kauders*, 159 N.E.3d at 1051 (quoting *Cullinane*, 893 F.3d at 62). *Kauders* thus explicitly endorses Plaintiffs' argument here. Northeastern did not use a common method of "conspicuously informing [students] of the

attention.[14] Given these significant ambiguities, the hidden nature of the Delivery of Services

language, and the explicit disclaimer that such language is contractual, the Delivery of Services

language is procedurally unconscionable. *See, e.g.*, *Waters v. Min Ltd.*, 587 N.E.2d 231, 235

(Mass. 1992); *Zapatha v. Dairy Mart, Inc.*, 408 N.E. 2d 1370, 1376 (Mass. 1980).

Defendant claims that there was no procedural unconscionability because Defendant

imposed the Portal Block to extract the Portal Block Agreements before the Spring 2020

semester such that any student could have withdrawn and received a full refund if the student did

not agree to the Delivery of Services language.[15] Mot. at 22. Northeastern further argues that

there was no time limit on students' review of the handbook or catalog. But both arguments

ignore the crux of the issue: the procedural unconscionability here principally arises out of

Northeastern's failure to properly identify what was in the contract. If a student cannot

reasonably ascertain that the Delivery of Services language is part of the Portal Block Agreement

because of Northeastern's ambiguous language, the fact that Northeastern buried[16] the Delivery

---

existence and location of" the Delivery of Services language as a contractual term" for the
reasons discussed throughout this Opposition. Further, even the language Northeastern cites is
off-point. In footnote 25, the court recognized that conspicuousness is a requirement for "certain
types of contractual provisions." Disclaimers, like the Delivery of Services language are just
such a type of provision, and for good reason: depriving a party of any remedy for a breach of
contract must be conspicuously disclosed. *See, e.g.*, *Ferguson v. Host Int'l, Inc.*, 53 Mass. App.
Ct. 96, 103 (2001) (disclaimer ineffective where it was the "functional equivalent of fine print"
and not "in a very prominent position"). Furthermore, *Kauders* explicitly rejected Uber's
purported contract specifically because "it [was] by no means ***obvious*** that signing up via an app
for ride services would be accompanied by the type of extensive terms and conditions present
here." *Kauders*, 159 N.E.3d at 1051. *Kauders* thus does not eschew "conspicuousness" and
supports Plaintiffs' position, not Northeastern's.

[14] With the exception of an uppercase heading in the Undergraduate Handbook and an italicized
heading in the Graduate Catalog, nothing sets the Delivery of Services language apart.

[15] Further discovery, including expert discovery, may reveal that it is not so simple for a student
to just withdraw from a university days before the term starts, and in fact, there are significant
market powers coercing students to accept even questionable terms. *See* Madden Aff. ¶38.

[16] Northeastern contends the Delivery of Services language was not "buried" because it was
included under the heading "General Information," "illustrating its likely applicability to all

of Services language in the materials it purports to incorporate, and the disclaimer of contractual intent preceding the Delivery of Services language, it is procedurally unconscionable even if the student had the option to withdraw and had unlimited time to review the materials.

### b. The Delivery of Services language is substantively unconscionable.

The Delivery of Services language is also substantively unconscionable because it allows Northeastern to retain all tuition and fees without providing the promised services and without regard to the relative burdens the circumstances "beyond [Northeastern's] reasonable control" impose on students and Northeastern. *See* SOF ¶¶12, 52 (setting forth the Delivery of Service language). Northeastern argues that there is no substantive unconscionability because "it is not surprising that the parties would agree to excuse Northeastern from liability for disruption of certain services due to reasons beyond its reasonable control and allow it, where necessary, to provide substitute services." *See* Mot. at 22-23. That is wrong.

While perhaps unsurprising that a student would excuse Northeastern from liability for *consequential* damages if Northeastern delayed providing promised services (*e.g.*, paying a student's off-campus rent for an extra month due to a temporary closure due to a terrorist attack), a reasonable student would absolutely be surprised that Northeastern could not provide the promised services yet keep all the students' tuition and fees. Northeastern has an endowment of

_____

students." Not so. First, the entire Graduate Catalog was "likely applicab[le] to all [graduate] students" and the entire Undergraduate Handbook was "likely applicab[le] to all [undergraduate] students." Thus, the header "General Information" signifies no supplemental applicability. Second, "General Information" does not sufficiently describe a contractual provision of the consequence that Northeastern assigns to the Delivery of Services language. Third, the "General Information" heading was buried in the "Appendix" of the Graduate Catalog (requiring the user to navigate to page 520 of the PDF version or click multiple links in the HTML version, none of which are properly labeled to identify to the user what was contained within) and buried in the "Additional Information" section on page 69 of the Undergraduate Handbook. Fourth, as set forth throughout this brief, the Portal Block Agreements only required that the student agree to policies regulating the student's conduct, not some "General Information."

more than a billion dollars, and its students pay tens of thousands of dollars a year, many (if not most) going into significant debt that they will pay back over the course of decades to do so, in order to receive the in-person instruction and access to campus facilities that Northeastern promises. That Northeastern is able to extract a (purported) contractual concession that it can both keep students' money and not provide the services is substantively unconscionable.

The Delivery of Services language—and indeed the Portal Block Agreements as a whole—are also substantively unconscionable because of the significant consideration disparity. When Northeastern imposes the Portal Block, Northeastern ceases to provide the services it was obligated to provide under the Overarching Contract, *e.g.*, allowing the student to register for courses or retrieve their grades. *See* SOF ¶9. Northeastern uses this Portal Block to bar access to part of the educational services the student has otherwise contracted to receive (including by agreeing to pay tens of thousands of dollars in tuition and fees), and to extract the students' agreement to "abide by the policies set forth" in the handbooks. But Northeastern does not reciprocate the students' agreement to abide by these policies with any new obligation from Northeastern. Instead, Northeastern simply provides the same services it had already agreed to provide the students through the Overarching Contract. In other words, under Northeastern's construction of the Portal Block Agreements, students take on obligations (to "acknowledge" notice, review, and understanding, and to "agree" to restrict the students' conduct according to Northeastern's regulations), but Northeastern takes on no new reciprocal obligation, instead merely allowing the students to continue to use that which they were previously using pursuant to existing agreements. *See* CSOF ¶¶7-8. In such a circumstance, the consideration students supposedly provide (agreeing to the Delivery of Services language) is so lopsided as compared to the consideration Northeastern provides (continued access to something the student had

21

previously been entitled to without any Portal Block Agreement—which may not rise to the level of "consideration" at all) to make it unconscionable. *See, e.g.*, *Waters*, 587 N.E.2d at 237 (one-sided consideration is substantively unconscionable).

Moreover, the Delivery of Services language is substantively unconscionable because Northeastern retains the right to unilaterally change the terms of the agreement at will. Courts in this District have found arbitration clauses (which are given heightened presumptions of enforceability under the Supreme Court's jurisprudence concerning the Federal Arbitration Act, 9 U.S.C. §1) unenforceable and illusory where the drafting party reserves to itself the right to unilaterally change the terms of the agreement. *See, e.g.*, *Nat'l Federation of the Blind v. Container Store, Inc.*, 2016 WL 4027711 (D. Mass. July 27, 2016); *Domenichetti v. Salter School, LLC*, 2013 WL 1748402, at *5 (D. Mass. Apr. 19, 2013); *see also Douglas v. Johnson Real Estate Investors, LLC*, 470 F. App'x 823, 825 (11th Cir. 2012) (applying Massachusetts law and finding employee's agreement to arbitrate unenforceable because employer retained unilateral right to alter terms). In fact, in *National Federation for the Blind*, the Court explicitly rejected the argument that the fact the non-drafting party could cancel the contract "at any time, including after any change in terms" negates the illusory nature of the agreement. 2016 WL 4027711, at *12-13. In the contractual disclaimers discussed *supra*, Northeastern reserved the right to unilaterally change the terms of the Undergraduate Handbook and Graduate Catalog. Such unilateral, illusory language negates the binding nature of the purported contracts here.

**B.  The SFRA Does Not Bar Plaintiffs' Claims**

The SFRA does not bar Plaintiffs' claims because the plain language of the Withdrawal Policy does not apply to the facts giving rise to Plaintiffs' claims. Plaintiffs did not withdraw or take a leave of absence from Northeastern for academic, discipline, personal, or medical reasons. But even if the plain language could be strained to support Northeastern's arguments, the SFRA-

based contentions fail for other reasons. The SFRA is a contract of adhesion because Northeastern presents it to students on a take-it-or-leave-it basis without any opportunity to negotiate. *See* CSOF ¶93. As relevant to this Motion, Northeastern relies on the SFRA's incorporation of Northeastern's Withdrawal Policy and related "published … refund schedule," and contends that the SFRA "allows for student refunds only in the event of a student withdrawal within the first five weeks of any academic semester." Mot. at 1. There is no support in the record for the proposition that refunds are exclusively provided through the Withdrawal Policy and related refund schedule.

First, nothing in the SFRA or the Withdrawal Policy states that the only circumstance under which a student may receive a refund is in accordance with the Withdrawal Policy. In fact, the Withdrawal Policy includes a link to another refund policy for circumstances in which a student overpays tuition. *See* CSOF ¶5. Because neither the SFRA nor the incorporated Withdrawal Policy state that withdrawal is the ***only*** basis for a refund, Northeastern cannot obtain summary judgment on Plaintiffs' refund claims due to the Withdrawal Policy. *Id.*

Second, the SFRA does not properly identify the "refund schedule" that is a critical part of Northeastern's argument. *See id.*[17] Although the SFRA asserts that the "refund schedule" is "published," Northeastern does not link to such refund schedule nor does it have a document or webpage available on its website that includes the term "refund schedule" in its title nor does Northeastern appear to use the term "refund schedule" in any publicly available document or

---

[17] Although the SFRA uses different terms to describe the refund schedule, *see* CSOF ¶5 (discussing the references to the "published withdrawal refund schedule" and the "published tuition refund schedule"), Northeastern appears to argue that these refund schedules are one and the same. Because neither the SFRA nor Northeastern's Statement of Facts (and its supporting affidavits) actually identify where any refund schedule was posted, Northeastern neither reasonably communicated the refund schedule to students nor met its summary judgment burden.

webpage other than the SFRA. *Id.* At a minimum, the failure to clearly identify where the refund schedule is published creates an ambiguity, if not manifest unfairness, as to what the SFRA incorporates as to a "refund schedule." Even in its Motion, Northeastern does not describe where the refund schedule was published. *See* SOF ¶5 (citing Andrade Aff. ¶12, which does not cite the webpage from which the screenshot was taken). Then, Northeastern quotes a refund schedule purportedly incorporated in the SFRA that is, at best, ambiguous as to whether it applies to circumstances other than where a student elects to withdraw from courses and/or the university. *Id.* (referencing "Refunds for Course Withdrawals" and "Refunds for Official Complete Withdrawal from the University"). Thus, the SFRA cannot be said to reasonably communicate that the Withdrawal Policy and/or refund schedule comprise the exclusive mechanism for students to obtain refunds; particularly where the refund is sought because Northeastern ceases to provide the services otherwise promised and not because the student seeks to withdraw for academic, discipline, personal, or medical reasons.[18]

## D.  CONCLUSION

For the foregoing reasons, and those in the Counterstatement of Facts and the Madden Affidavit, Plaintiffs respectfully request that the Court deny the Motion with prejudice as to all counts, or alternatively, deny the Motion without prejudice to re-raising it after the close of discovery or, at a minimum, permit Plaintiffs to take discovery pursuant to Fed. R. Civ. P. 56(d).

---

[18] Additionally, applying the Withdrawal Policy and refund schedule here would be unconscionable. Procedurally, Northeastern did not reasonably communicate the refund schedule's terms or its applicability here. Substantively, interpreting the refund schedule as Northeastern proposes would allow Northeastern to breach the contract, not provide any services whatsoever following a given point in the semester, and leave students with no recourse. Such lopsided terms are unquestionably substantively unconscionable as no reasonable person would agree to allow Northeastern to walk away with their money without providing promised services for any reason or no reason whatsoever. Further, if the Court grants the Motion on the Withdrawal Policy, depending on the ruling's scope, the unjust enrichment claim could survive.

Dated:  March 24, 2021                    Respectfully submitted,


                                          **PASTOR LAW OFFICE, LLP**

                                          /s/ David Pastor_____
                                          David Pastor (BBO #391000)
                                          63 Atlantic Avenue, 3d Floor
                                          Boston, MA 02110
                                          Telephone: (617) 742-9700
                                          Facsimile: (617) 742-9701
                                          Email: dpastor@pastorlawoffice.com

                                          **BURSOR & FISHER, P.A.**
                                          Frederick J. Klorczyk III*
                                          Alec M. Leslie*
                                          888 Seventh Avenue
                                          New York, NY 10019
                                          Telephone: (646) 837-7150
                                          Facsimile: (212) 989-9163
                                          Email: fklorczyk@bursor.com
                                              aleslie@bursor.com

                                          **BERGER MONTAGUE PC**
                                          Shannon J. Carson*
                                          Patrick F. Madden*
                                          1818 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Telephone: (215) 875-3000
                                          Email: scarson@bm.net
                                              pmadden@bm.net

                                          **BERGER MONTAGUE PC**
                                          E. Michelle Drake*
                                          Joseph C. Hashmall*
                                          43 SE Main Street, Suite 505
                                          Minneapolis, MN 55414
                                          Telephone: (612) 594-5999
                                          Email: emdrake@bm.net
                                              jhashmall@bm.net

                                          **MASON LIETZ & KLINGER LLP**
                                          Gary M. Klinger *
                                          227 W. Monroe Street, Suite 2100
                                          Chicago, IL 60606
                                          Telephone: 773-545-9607
                                          Email: gklinger@masonllp.com

25

**MASON LIETZ & KLINGER LLP**
Gary E. Mason*
5101 Wisconsin Avenue NW
Suite 305
Washington, DC 20016
Telephone: 202- 429-2290
Email: gmason@masonllp.com

**THE HOLMES LAW GROUP, LTD.**
W. Clifton Holmes*
350 N. Orleans Street, Suite 9000N
Chicago, IL 60654
Telephone: (312) 721-0779
Email: holmes@theholmeslawgroup.com

**HARTMAN LAW, PC**
Douglas F. Hartman (BBO#642823)
Suite 800 South
10 Post Office Square
Suite 800 South
Boston, MA 02109
Telephone:  617-807-0091
Fax: 617-507-8334
Email: dhartman@hartmanlawpc.com

*Admitted *pro hac vice*

***Attorneys for Plaintiffs and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document and its supporting exhibits were filed through the ECF system on March 24, 2021 which will effectuate service electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ David Pastor
David Pastor